IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  09-cv-00996-WYD-KMT

MARIA ANDREOPOULOS,

 Petitioner,

v.

NICKOLAOS KOUTROULOS;
MRS. KOUTROULOS; and
IOANNIS KOUTROULOS,

 Respondents.

---

**ORDER**

---

I. Introduction:

THIS MATTER is before the Court on the Petition for the Return of Minor Child to Petitioner, filed April 30, 2009 [#3].  The Petition was filed pursuant to the Convention on the Civil Aspects of International Child Abduction ("Convention"), done at The Hague, Netherlands on October 25, 1980, 51 Fed. Reg. 10493, March 26, 1986, and federal legislation facilitating and implementing the Convention in the  United States, the International Child Abduction Remedies Act, Public Law 100-300 at 42 U.S.C. 11601, *et seq.*

Petitioner, Maria Andreopoulos, alleges that the minor child, G.K. was wrongfully removed from his habitual residence of Greece by his father, Respondent Nickolaos Koutroulos, in violation of her custody and rights.  The Petitioner seeks the return of the

minor child to Greece.  A hearing was held on the Petition over several days including June 3, 2009, June 5, 2009, and June 11, 2009.  Both Petitioner and Respondent testified at the hearing.  In addition, Petitioner called attorney George S. Kounoupis to testify as to the interpretation of the Greek Custody Agreement.  Respondent called the minor child's godmother, Athena Hristopoulos, and Joanna C. Ioannides, LCSW, a licensed therapist and social worker who had evaluated the minor child to testify as to the minor child's maturity and assessment of appropriate decision-making skills.  The minor child testified twice on two different days during the course of the hearing.  In addition, I spoke with the minor child *in camera*.

II.     Background:

Petitioner and Respondent were married in Agrinio Greece on October 30, 1993, and subsequently moved to Denver, Colorado USA.  Respondent has duel nationality and is a citizen of Greece and a naturalized American citizen.  Petitioner is a citizen of Greece and obtained resident alien status during the time she lived in the United States.  The parties' minor child, G.K. was born in Colorado on March 13, 1995, and is currently 14 years old.  At some point, G.K. left the United States and moved to Greece to live with his maternal grandparents.  Petitioner testified that this occurred when G.K. was approximately three and one-half years of age.  Respondent, on the hand, testified that Petitioner brought or sent G.K. to Greece to live with his maternal grandparents without his permission sometime in December 1999, while Petitioner and Respondent continued to live and work in Denver, Colorado.  On June 12, 2000, the parties filed a petition for the dissolution of their marriage by consent divorce in the District Court of Agrinio,

Greece, and on August 28, 2000, Petitioner filed for Dissolution of Marriage in Denver County District Court in Denver, Colorado. On September 10, 2001, the District Court of Agrinio Greece pronounced the marriage between Petitioner and Respondent "dissolved" and validated the parties custody agreement, which was initially entered into on December 5, 2000. Both parties were in Greece when the custody agreement was signed. The Denver District Court case was closed on September 10, 2001, upon the parties decision to obtain their divorce in Greece.

At the time the custody agreement was entered on December 5, 2000, G.K. was residing with his maternal grandparents in Greece. According to Respondent, he requested that G.K. be returned to the United States and G.K.'s maternal grandfather did bring him to the United States on or about May 2001. From May, 2001 to September 2001, the parties shared custody of G.K. in the United States. However, on September 10, 2001, Respondent returned G.K. to Greece to live with his maternal grandparents, while both Petitioner and Respondent remained in the United States. Respondent testified that he returned G.K. to Greece in September 2001 so that he could attend school and stated that G.K. was unable to attend school in the United States at that time due to his lack of proficiency in English.

On or about January, 2005, following the death of her mother, Petitioner left the United States and returned to Greece. Respondent testified that he assisted Petitioner in obtaining the documentation that would allow her to go to Greece, and paid all of the expenses associated with her trip on the condition that she return to the United States with G.K. However, Petitioner did not return to the United States, and since 2005 she

has lived and worked in Greece.  Petitioner testified that upon her return to Greece in 2005, she provided for G.K.'s food, clothing and shelter, and made all decisions relevant to his safety, medical care, and discipline.  Respondent testified that he objected to Petitioner remaining in Greece with G.K., and stated that he traveled to Greece in July of 2005 to visit with G.K. and bring him back to the United States, but Petitioner did not allow him to do so.  Respondent also testified that G.K. came back to the United States for a visit during the Christmas holiday of 2006, but stated that he did not attempt to keep him in the United States at that time because he was enrolled in school in Greece.

Sometime during the 2007-2008 school year, G.K. began to resist attending school and eventually amassed 64 hours of absences (the equivalent of eight or nine full days of school).  According to Petitioner, after 64 hours of absences, a child is not allowed to continue attending school.  It appears that G.K. stopped attending school from approximately February 2008 to the end of the 2007-08 school year.

In the Spring of 2008, Petitioner agreed to allow G.K. to travel to the United States with his maternal uncle.  According to Petitioner, this visit was to last for approximately 20 days during the month of June, after which time she expected G.K. to return to Greece.  Petitioner testified that when she realized that G.K.'s uncle had returned to Greece without G.K., she immediately filed criminal charges against Petitioner in Greece.  It is not clear precisely when this occurred, however a formal Legal Complaint against Respondent was lodged with the Public Prosecutor of Agrinio sometime in early October, 2008.  Then on October 31, 2008, Petitioner filed an application for return of G.K. through the Greek Central Authority.  Petitioner testified

that over the past year she has encountered difficulty communicating with her son over the telephone because Respondent disconnected his home telephone and insisted that she only contact G.K. at Respondent's business on Saturdays.  Petitioner further testified that when she was able to speak with G.K., he requested to return to Greece.  Petitioner stated that in the two months prior to the time she filed her petition in this court, G.K. stopped requesting to return because Respondent told him that if he returned, Petitioner would have Respondent put in jail.

Respondent's testimony concerning the circumstances by which G.K. came to stay with him in the United States in June of 2008 and the events that occurred thereafter conflicts with the testimony of Petitioner.  According to Respondent, when he discovered in 2008 that G.K. was not attending school in Greece, he asked Petitioner to allow G.K. to come to the United States and enroll in English classes so that he could eventually attend school in the United States.  According to Respondent, prior to G.K.'s departure, Petitioner agreed that if Respondent could get G.K. to attend school in the United States, he could remain there with Respondent.  Respondent stated that he enrolled G.K. in English language school during the summer and continually informed Petitioner of G.K.'s progress.  Sometime during the month of August, 2008, Respondent testified to a telephone conversation between himself, Petitioner and G.K. in which Respondent informed G.K. that he would be attending West Middle School in Colorado for the upcoming school year and Petitioner agreed.  G.K. also testified that Petitioner agreed that he should remain in the United States and begin attending school there.  According to Respondent, and the testimony of Respondent's godmother, G.K. was

initially reluctant to attend school, and would ask to be sent back to Greece, but eventually became accustomed to school in the United States and is now doing well. Respondent acknowledged that he returned to Greece in October, 2008 to visit his mother, and admitted that he did not attempt to contact Petitioner during this visit. He further testified that at that time he was unaware that Petitioner had filed criminal charges against him. Sometime during that visit or shortly thereafter, Respondent learned that Petitioner had lodged a criminal complaint against him. According to Respondent, he did not become aware of Petitioner's objections to G.K. remaining in the United States until October 2008 when, according to Respondent, Petitioner changed her mind about their arrangement and requested that G.K. be returned to Greece. Respondent was notified of the Hague Petition on December 29, 2008.

     G.K. testified twice during the hearing on the petition, once with the aid of a Greek interpreter. In addition, I spoke privately with G.K. in my Chambers. On the first day of the hearing G.K. testified that during the 2007-08 school year he had stopped attending school in Greece and admitted that he amassed more than 64 hours of absences and was no longer permitted to attend school. According G.K., he understood that his visit to the United States in June 2008 was to last the entire summer and when he arrived in the United States he was enrolled in English classes. Sometime at the end of the summer, Respondent informed him that he would not return to Greece and would stay in the United States to attend school. G.K. testified that around this same time he participated in a telephone conversation involving Petitioner and Respondent during which Respondent informed Petitioner that G.K. was doing well in

his English classes and would remain in the United States for the upcoming school year and Petitioner agreed to this arrangement. G.K. stated that while he initially objected to remaining in the United States, he eventually became accustomed to school here. G.K. testified unequivocally that while he has friends and relatives in Greece, he wishes to remain in the United States with Respondent and attend school here, and that school in Greece is more difficult than school in the United States. G.K. further testified that over the past year he spoke with Petitioner on the telephone once a week or once ever other week and indicated that he cannot recall a situation where Respondent prevented him from speaking with Petitioner.

On the third day of the proceedings, at Respondent's request, G.K. testified for a second time without the aid of an interpreter. G.K. stated that Respondent requested that he testify again because he had not "say a lot of stuff" before due to his desire to spare Petitioner's feelings. G.K. testified that he became angry with Petitioner because he believed she had lied to him about the existence of other half-siblings. G.K. further testified that when he was living with Petitioner in Greece, Petitioner would sometimes come home late at night and that he had to sleep at his Aunt's home. G.K. also testified that he would occasionally argue with Petitioner when she would ask him to run errands for her and buy her cigarettes. G.K. testified that "everyone knew about this stuff" and that is why he didn't want to go to school in Greece.

III.    Analysis:

In the petition now before the Court, Petitioner alleges that G.K. is under 16 years of age, and had been wrongfully removed from his habitual residence (Greece) in

breach of the custody rights of Petitioner. In response, Respondent contends that G.K.'s habitual residence is Denver, Colorado, and that he is the legal custodian of G.K., to the extent the Greek decree is valid. Respondent further contends that Petitioner consented to G.K. remaining in Colorado, and that G.K. objects to being returned to Greece and wishes to attend school in the United States. According to Respondent, G.K. is of sufficient age and maturity to make this decision. Finally, Respondent contends that returning G.K. to Greece would expose him to grave psychological harm due to Petitioner's alleged decision to allow him to "drop out" of school.

"The Convention and ICARA serve, in part, to prevent parents from abducting children in order to avoid the jurisdiction of courts with rulings they do not (or believe they will not) agree." *Shealy v. Shealy*, 295 F.3d 1117, 1121 (10th Cir. 2002). "The treaty and legislation seek 'to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" *Id.* (quotation omitted). However, the scope of inquiry under the Hague Convention "is limited to the merits of the abduction claim", not any underlying custody disputes. *Id.* (quotation omitted). "In a case arising under ICARA and the Hague Convention, the district court must determine whether the removal of a child was 'wrongful' under the definition as set forth in the Convention." *Id.* at 1121-22. "The petitioner bears the burden of showing by a preponderance of the evidence that the removal . . . was wrongful." *Id.*

Article 3 of the Hague Convention outlines when the removal or retention of a child is wrongful for the purposes of Article 12. Pursuant to Article 3:

> The removal or the retention of a child is wrongful if:
>
> a) it is in breach of rights of custody attributed to a person, an institution of any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been exercised but for the removal or retention.

*Whallon v. Lynn*, 230 F.3d 450, 454 (1st Cir. 2000). No wrongful removal exists without the possession of custodial rights by the parent seeking the child's return. *Gonzales v. Guiterrez*, 311 F.3d 942, 948 (9th Cir. 2002).

If the petitioner establishes these elements "the authority concerned [the court] shall order the return of the child forthwith" unless certain exceptions under Art. 13 and 20 can be established by the Respondent. 42 U.S.C. § 11603(e)(2). These exceptions include that: "1) the person requesting return was not at the time of the retention or removal, actually exercising custody rights or had consented to or subsequently acquiesced in the removal or retention . . . [which must be proved by a preponderance of the evidence]; [and] 2) the return of the child would result in grave risk of physical or psychological harm to the child . . . [which must be proved by clear and convincing evidence] . . .." *Ohlander v. Larson*, 114 F.3d 1531, 1534 (10th Cir. 1997); 42 U.S.C. § 11603(e)(2).

    A.    <u>Habitual Residence of G.K.</u>

I first address G.K.'s habitual residence prior to the alleged wrongful removal. Petitioner asserts that G.K. was a habitual resident of Greece prior to the alleged

wrongful removal while Respondent contends that G.K. was a habitual resident of the United States prior to the alleged wrongful removal. Respondent's argument is premised on his assertion that any alleged retention of G.K. did not occur until sometime in October, 2008, at which time G.K. was habitually resident in the United States. Respondent contends that prior to October 2008, Petitioner was not exercising custody rights with respect to G.K. or, in the alternative, acquiesced to G.K.'s removal to the United States.

The term "habitual resident" is not defined in the Hague Convention or the International Child Abduction Remedies Act. As a consequence, courts have held that the facts and circumstances of each case must be assessed. *See Prevot v. Prevot*, 59 F.3d 556, 560 (6th Cir. 1995). "'The intent is for the concept . . . to remain fluid and fact based, without becoming rigid.'" *Prevot*, 59 F.3d at 560 (quoting *Levesque v. Levesque*, 816 F. Supp. 662, 666 (D. Kan. 1993)). The Third Circuit in *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3rd Cir.1995) defined habitual resident as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." The Third Circuit went on to hold, "We further believe that a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." *Id.* The Fourth Circuit in *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) stated that it was guided by its sister circuits in concluding that "'there is no real distinction between ordinary residence and habitual residence" (quoting *Friedrich v.*

*Friedrich*, 938 F.2d 1396, 1401 (6th Cir. 1993) ("*Friedrich I*") and *Ryder v. Ryder*, 49 F.3d 369, 373 (8th Cir. 1973)). The Sixth Circuit in *Friedrich I* held that "habitual residence must not be confused with domicile" and that "[o]n its face, habitual residence pertains to customary residence prior to the removal." *Friedrich*, 938 F.2d at 1401. It further held that "[t]o determine the habitual residence, the court must focus on the child, not the parents, and examine past intentions, not future intentions." *Id.*

Here, even if the wrongful removal of G.K. occurred in October 2008, as Respondent suggests, G.K.'s habitual residence immediately prior to the time of the removal was Greece. There is no dispute that G.K. has lived in Greece since at least December 1999 when he was approximately 4 and one-half years-old. While G.K. has made visits to the United States since that time, he has always returned to Greece. In fact, Respondent returned G.K. to Greece following the parties' divorce in 2001, and again following G.K.'s visit for the Christmas holiday in December of 2006. I find that the three months G.K. spend in the United States during the Summer of 2008 did not sufficiently acclimate him to the United States such that the United States became his habitual residence. Clearly, Greece is the place where G.K. "has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder*, 63 F.3d at 224.

B.     Whether the Petitioner Has Exercised Rights of Custody

Next, I must determine whether Petitioner has established by a preponderance of the evidence that she was exercising custody rights under the laws of Greece immediately prior to the wrongful removal or retention. As an initial matter, I must

determine whether the parties' custody agreement provides the Petitioner with a right of custody. Pursuant to Article 3, custody rights may arise (a) by operation of law, or (b) by reason of a judicial or administrative decision or an agreement having legal effect under the law of the country of habitual residence. In addition, Article 5 of the Hague Convention distinguishes between "rights of access" and " rights of custody" for the purposes of the Hague Convention as follows:

> a) "rights of custody" shall include *rights relating to the care of the person of the child* and, in particular, the *right to determine the child's place of residence;*
>
> b) "rights of access" shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

Hague Convention, art. 5. Case law makes it clear that the remedy of return is solely for violations of rights of custody. *Whallon,* 230 F.3d at 455.

Here, the parties entered a custody agreement concerning G.K. on December 5, 2000. At the time the custody agreement was signed, G.K. was residing in Greece with his maternal grandparents and both Respondent and Petitioner were residing in Denver, Colorado. The portion of the parties' custody agreement pertaining to "Parental Care, Custody and Communication" provides in the first paragraph that "[t]he parental care and custody of our minor child [G.K.] is granted as of this day to the mother Maria . . . ." The remaining paragraphs of the custody agreement state as follows:

> *If Maria Koutroulou does not leave the USA to move to Greece up to 28-2-2001 and Nikolaos Koutroulos does not do the same thing, Maria Koutroulou shall be required to take her child in the USA, otherwise the parental care and custody of the child shall be transferred to Nikolaos Koutroulos.*

> *If Maria Koutroulou does not leave the USA to move to Greece up to 28-2-2001 and Nikolaos Koutroulos moves to Greece, the parental care and custody of the child shall be transferred to Nickolaos Koutroulos as from 1-3-2001.*
>
> *If Maria Koutroulou remains in the USA and Nikolaos Koutroulos does the same thing, Maria Koutroulou shall keep the parental care and custody.*
>
> *If Maria Koutroulou remains in the USA, and Nickolaos Koutroulos moves to Greece, the parental care and custody shall be transferred to him.*
>
> *If both parents move to Greece, Maria Koutroulou shall keep the parental care.*
>
> *If Maria Koutroulos moves to Greece and Nickolaos Koutroulos remains in the USA, Maria Koutroulos shall keep the parental care.*

The custody agreement further provides that:

> *During the months of the summer, the child shall remain with the parent that shall have the parental care and custody, whilst the other parent shall be entitled to take it for communication in the even years in August from August 1st, 10 am up to August 31st, 10.00 pm, whilst in the odd years, in July from July 1st, 10 am to July 31st, 10 pm.*

Both parties contend that they have custody rights under the custody agreement. Petitioner presented testimony from attorney George Konupis, an attorney who speaks Greek and has practiced in both Greece and the United States, who stated that while the agreement was unusual, it should be interpreted to provide for shifting custody, depending on where the parties reside. Utilizing this interpretation, Petitioner asserts that she has custody of G.K. pursuant to the portion of the agreement that provides "*If Maria Koutroulos moves to Greece and Nickolaos Koutroulos remains in the USA, Maria

*Koutroulos shall keep the parental care."* Petitioner notes that she moved to Greece sometime in 2005 and has assumed care and custody of G.K. since that time up to the time of his removal.

Respondent disagrees with Petitioner's interpretation of the custody agreement. According to Respondent, because Petitioner did not *"leave the USA to move to Greece,"* by February 28, 2001, and did not "*take her child in the USA*," the "*care and custody*" of G.K. transferred to him and remained fixed with him as of that date. Respondent contends that he placed G.K. with his maternal grandparents in 2001, and returned to Greece to obtain G.K. in 2005, but Petitioner would not give him access to G.K. at that time. Respondent testified that he consulted with an attorney in Greece, who advised him that the Greek courts would not enforce the custody agreement over the G.K.'s objection.

The custody agreement is not a model of clarity. The agreement initially grants custody to Petitioner and then outlines how that initial grant of custody could change under various scenarios. However, even assuming custody transferred to Respondent in 2001, when Petitioner failed to "*take her child in the USA*" by that date, pursuant to the first paragraph of the agreement, the custody agreement clearly provides under the sixth paragraph that if Petitioner moves to Greece, and Respondent remains in the United States, custody remains with Petitioner. The problem with Respondent's interpretation of the custody agreement is that assuming custody of G.K. is "fixed" based on the provisions of the first two paragraphs, the remaining paragraphs are rendered meaningless. After careful consideration, I find that Petitioner has

established, by a preponderance of the evidence, that she had custody rights under Greek law, pursuant to the parties' private custody agreement at the time immediately before the removal or retention of G.K.  I note that Respondent and Petitioner disagree about when the retention of G.K. became "wrongful."  According to Respondent, the retention of G.K. did not become wrongful until October, 2008, the time when Petitioner requested that G.K. return to Greece.  Resolution of this issue is unnecessary, however, as it will not change the analysis herein.  Petitioner has established, by a preponderance of the evidence, that at the time of Respondent's retention of G.K., whether that retention became wrongful in July 2008 or October 2008, she was exercising custody rights over G.K., or would have exercised custody rights but for the retention.  *See* Hague Convention, art. 3(b);  *Furnes v. Reeves*, 362 F.3d 702, 715 (11th Cir. 2004) (noting that "custody of a child entails the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention, education, etc. . . . ").

      C.      Respondent's Defenses to Petitioner's Claims

Having found that Petitioner has established the elements of her wrongful removal claim by a preponderance of the evidence, I now address Respondent's defenses.  The statutory exceptions are to be construed narrowly, since "[t]he Convention establishes a strong presumption favoring return of a wrongfully removed child."  *Danaipour v. McLarey*, 286 F.3d 1, 13-14 (5th Cir. 2002).  Morever, these exceptions may not be used to litigate the child's best interests", nor are they established by simply showing that "adjustment problems that would attend the

relocation of most children." *Danajpour*, 286 F.3d at 14; *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996). Finally, "a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Id.*

### 1. The Views of the Child

First, I consider whether to apply the "wishes of the child" exception. Under this exception, the court may refuse to order the return of the child "if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. This defense must be proven by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2). The *Pérez-Vera Report*[1] offers the following commentary with respect to the views of the child exception:

> [The Convention] provides that the child's views concerning the essential question of its return or retention *may be conclusive*, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests. Of course. This provision could prove dangerous if it were applied by means of the direct questioning of young people who may admittedly have a clear grasp of the situation but who may also suffer serious psychological harm if they think they are being forced to choose between two parents. However, such a provision is absolutely necessary given the fact that the Convention applies, *ratione personae*, to all children under the age of sixteen; *the fact must be acknowledged that it would be very*

---

[1] The Explanatory Report of Professor Elisa Pérez-Vera, referred to as the *Pérez-Vera Report*, is recognized as the official history and commentary on the Hague Convention. Pub. Notice 957, 51 Fed. Reg. at 10503.

-16-

> *difficult to accept that a child of, for example, fifteen years of age, should be returned against its will.*

*Pérez-Vera Report* at 433, para. 30 (emphasis added).

Respondent must prove by a preponderance of the evidence through testimony or otherwise that the minor child is of an age and maturity level for their views to be taken into account. *See England v. England*, 234 F.3d 268, 272 n. 5 (5th Cir. 2000).[2] In assessing the maturity level of the minor child, the court must consider the extent to which the "child[ren]'s views have been influenced by an abductor, or if the objection is simply that the child wishes to remain with the abductor." *In Re Nicholson*, 1997 WL 446432 (D. Kan. 1997) (unreported). Application of the defense is within the court's

---

[2] There is no defined age at which the Convention considers children sufficiently mature enough for their views to be taken into account – it depends on the child. See *Blondin v. Dubois*, 238 F.3d 153, 166-67 (2nd Cir. 2001) (declining to hold as a matter of law that 8 year old girl was too young for her views to be taken into account, and holding that district court did not err in finding that 8 year old was mature enough to have her views taken into account); *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000) (declining to hold as a matter of law that 13 year old child is not mature enough, but affirmed district court's decision that the 13 year old at issue was not mature enough where she had four mothers in 12 years, had been diagnosed with ADD and had learning disabilities, and was scared and confused by proceedings); *Silverman v. Silverman*, 2002 WL 971808 at *10 (D. Minn. 2002), (determining, after judge took 10 year old child into chambers for an ex parte discussion, that 10 year old boy was of an age and maturity level at which views could be considered in connection with the defense involving a grave risk of harm to child – the court was "particularly impressed by his behavior in learning of the upcoming legal proceedings and his desire to express his views in a letter and have them considered"), aff'd, 312 F.3d 914 (8th Cir. 2002); *Mendez Lynch v. Mendez Lynch,* 220 F. Supp. 2d 1347, 1361 (M.D. Fla. 2002) (testimony showed that 9 year old boy had attained age/maturity at which it was appropriate to take into account his objections to returning to Argentina, but court "exercised its discretion" to return child to Argentina where "[h]is memories of Argentina are those of a six year old, he has been in the virtually exclusive custody of his mother in the United States since his removal from Argentina, and his mother has articulated a desire not to return to Argentina since almost the beginning of her arrival" in the United States).

discretion if the court believes that the child's preference is the product of undue influence over the child. *See Hazbun Escaf v. Rodriguez*, 200 F.Supp.2d 603, 615 (E.D. Va. 2002) ("[t]he discretionary aspect of this defense is important because of the potential for undue influence by the person who allegedly wrongfully retained the child").

I find that the Respondent has proven by a preponderance of the evidence that G.K. is of the age and maturity level for his opinions to be taken into account. I further find no evidence that Respondent unduly influenced G.K.'s views. First, I note that G.K. turned fourteen years-old in March of this year. During the hearing, Respondent presented testimony from a therapist (qualified as an expert in providing psychotherapy and treating and evaluating children) who testified she met with G.K. individually for several hours over three different sessions and concluded that G.K. demonstrated age appropriate maturity and morality levels. Based on G.K.'s age, the testimony of the therapist, and my observations of G.K. in court and in my Chambers, I conclude that he has attained an age and degree of maturity at which it is appropriate to take account of his views.

G.K. testified twice during the proceedings, and I spoke with him once in my Chambers. On all three occasions he expressed his objection to returning to Greece, and his strong desire to remain in the United States. The first time G.K. testified, with the aid of an interpreter, G.K. stated that while he initially objected to attending school in the United States, he has become accustomed to school here, and enjoys school in the United States. In Chambers, G.K. stated that he prefers school in the United States because it is "easier" and that while he has friends and relatives in Greece, he wishes to

remain in the United States with Respondent and attend school here. He stated that he has made friends in the United States, and perceives greater opportunities for educational advancement if he remains in the Untied States. While he stated that he loved Petitioner, he firmly told me that he would not return to school if I ordered him to go back to Greece. On the third day of the proceedings, at Respondent's request, G.K. testified for a second time. G.K. stated that Respondent requested that he testify again because he had not "say a lot of stuff" before due to his desire to spare Petitioner's feelings. G.K. testified that he became angry with Petitioner because he believed she had lied to him about the existence of other half-siblings. G.K. further testified that when he was living with Petitioner in Greece, Petitioner would sometimes come home late at night and that he had to sleep at his Aunt's home. G.K. also testified that he would occasionally argue with Petitioner when she would ask him to run errands for her and buy her cigarettes. G.K. testified that "everyone knew about this stuff" and that is why he didn't want to go to school in Greece. Although English is G.K.'s second language, I found him to be reasonably articulate, and to demonstrate appropriate responses to questions during this difficult situation. I further find that G.K. demonstrated an understanding of the nature of the proceedings. In addition, I find no evidence that G.K.'s testimony was coached or unduly influenced by Respondent.

With the foregoing factors in mind and despite the fact that I conclude that Respondent's retention of G.K. was wrongful, I find G.K.'s views to be dispositive of the issues before me. Because I find that G.K. is of sufficient age and maturity that his views should be taken into account, and because G.K. clearly and unequivocally

expressed his objection to returning to Greece and his desire to remain in the United States, I will refuse to return the him to Greece on that basis. *See De Silva v. Pitts*, 481 F.3d 1279 (10th Cir. 2007) (affirming the district court's refusal to repatriate minor child to Canada solely on the basis of the minor child's desire to stay in the United States); *McManus v. McManus*, 354 F.Supp.2d 62 (D. Mass. 2005) (district court easily concluded that the objections of two minor children, both fourteen-years-old, should be honored and were dispositive of the issues before the court).

Because my decision that G.K.'s objection to returning to Greece is dispositive of the issues before me, I need not decide Respondent's remaining defenses.[3]

IV.   Conclusion

For the foregoing reasons, it is

ORDERED that the Petition for the Return of Minor Child to Petitioner, filed April 30, 2009 [#3] is **DENIED** and this case is **DISMISSED**.

Dated:  June 29, 2009

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge

---

[3] While I need not decide Respondent's remaining defenses, I note that I am disinclined, based on the record before me, to find that Respondent has established either the "grave risk of harm" defense or the defenses of "consent and acquiescence."